**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **No. 23-cr-381 (TSC)** |
| | **:** | |
| **GRAHAM ASH** | **:** | |

## DEFENDANT'S SENTENCING MEMORANDUM

On November 26, 2024, Mr. Graham Ash entered a plea of guilty to Coercion and Enticement of a Minor in violation 18 U.S.C. § 2422(b). He will appear before this Honorable Court for sentencing on April 22, 2025. Mr. Ash respectfully submits the following for the Court's consideration in determining an appropriate sentence based on the sentencing factors set forth in 18 U.S.C. § 3553(a). Mr. Ash respectfully requests that the Court sentence him to the mandatory minimum term of incarceration of 10 years (120 months), to run concurrently with any future sentence he receives from the Northern District of Alabama in case number 2:24-cr-297-ACA-SGC. Mr. Ash believes the requested sentence is sufficient, but not greater than necessary, to satisfy the purposes of punishment and account for the factors in § 3553(a).

Specifically, Mr. Ash is asking the Court to vary downward based on (1) the overstatement of his criminal history category by the use of USSG § 4B1.5(a)(2)(B), moving him from category I to category V; (2) the use of a computer enhancement, which applies in virtually every case; (3) his acceptance of responsibility through his plea agreement; and (4) the prosecution's decision to require Mr. Ash to face charges in two jurisdictions, thereby increasing his potential sentencing exposure rather than permitting all charges to be resolved in one jurisdiction, either Alabama or the District of Columbia. Taking into consideration the guidelines variances noted above, the appropriate guidelines range would be 168-210 months. Mr. Ash argues that his personal history and characteristics, as well as the nature of the charging

decisions in this case, warrant a further variance to the mandatory minimum sentence of 120 months.

## I.  LEGAL STANDARD

When imposing a sentence, the Court must consider several factors, including (1) the United States Sentencing Guidelines; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct, along with the kinds of sentences available; and (5) the need to avoid unwarranted disparities.  *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

*See* 18 U.S.C. § 3582 (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  18 U.S.C. § 3553(a) (emphasis added).

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall*, 552 U.S. at 50.

Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

## II.  ARGUMENT

### A.  Mr. Ash's Criminal History Category is CHC I.[1]

On November 26, 2024, Mr. Ash pled guilty to one count of Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b). Mr. Ash has a one prior conviction for Electronic Solicitation of a Child in Alabama, in violation of Ala. Code 1975 § 13A-6-124. This provision provides that

> Any person who travels either within this state, to this state, or from this state by any means, who attempts to do so, or who knowingly causes another to do so or to attempt to do so for the purpose of engaging in any unlawful sex act with a child, including sexual intercourse, sodomy, a sexual performance, obscene sexual performance, or other sexual conduct for his or her benefit or for the benefit of another shall be guilty of traveling to meet a child for an unlawful sex act. Any person who violates this section commits a Class A felony.

Ala. Code 1975 § 13A-6-124. The term "sex act" "include[s] sexual intercourse, sodomy, sexual performance, obscene sexual performance, or sexual conduct for his/her benefit." *See* Ala. Code

---

[1] Counsel neglected to include this objection to the PSR in the objections filed on March 27, 2025.

1975 § 13A-6-111(d). The term "sexual performance" "means an act or show intended to arouse, satisfy the sexual desires of, or appeal to the prurient interests of patrons or viewers, whether public or private, live, photographed, recorded, videotaped, or projected over the Internet." *See* Ala. Code 1975 § 13A-6-151(7)(b)(1). Therefore, Electronic Solicitation of a Child in Alabama can include attempting to travel to watch a minor engage in a provocative dance which was "intended to arouse."

The government and Probation argue that Mr. Ash's prior conviction qualifies as a "sex offense conviction" under the Sentencing Guidelines, and therefore USSG § 4B1.5(a)(2)(B) dictates that Mr. Ash's criminal history category is V, not I. Section 4B1.5(a) states:

> In any case in which the defendant's instant offense of conviction is a covered sex crime, 4B1.1 (Career Offender) does not apply, and the defendant committed the instant offense of conviction subsequent to sustaining at least one sex offense conviction: . . .
>
> (2) The criminal history category shall be the greater of (A) the criminal history category determined under Chapter Four, Part A (Criminal History); or (B) criminal history Category V.

USSG § 4B1.5(a). Sex offense is defined as follows:

> "Sex offense conviction" (I) means any offense described in 18 U.S.C. § 2426(b)(1)(A) or (B), if the offense was perpetrated against a minor; and (II) does not include trafficking in, receipt of, or possession of, child pornography. "Child pornography" has the meaning given that term in 18 U.S.C. § 2256(8).

USSG § 4B1.5, Application Note 3(A)(ii). Section 2426 defines "prior sex offense conviction" as:

> a conviction for an offense--
>
> (A) under this chapter, chapter 109A, chapter 110, or section 1591; or
>
> (B) under State law or the Uniform Code of Military Justice for an offense consisting of conduct that would have been an offense under a chapter referred to in subparagraph (A) if the conduct had occurred within the special maritime and territorial jurisdiction of the United States.

4

Therefore, Mr. Ash's Alabama conviction must be for an offense categorically equivalent to one of the applicable federal offenses. *See United States v. Lusk*, 119 F.4th 815, 828 (11th Cir. 2024) (finding the categorical approach applies when determining whether a prior offense qualifies as a sex offense conviction under 4B1.5 (citing *United States v. Dahl*, 833 F.3d 345 (3d Cir. 2016)).

The closest federal analogue to Mr. Ash's prior conviction is 18 U.S.C. § 2423(b), Travel with Intent to Engage in Illicit Sexual Conduct. "Illicit sexual conduct means":

> (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States;
>
> (2) any commercial sex act (as defined in section 1591) with a person under 18 years of age; or
>
> (3) production of child pornography (as defined in section 2256(8)).

*Id.* § 2423(g). "Sexual act" is defined as:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;
>
> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
>
> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
>
> (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

18 U.S.C. § 2246(2).

Alabama Electronic Solicitation of a Child does not require intent to engage in a sexual act as defined by § 2246(2). It criminalizes much broader conduct, including travel with intent to watch a minor engage in a provocative dance intended to arouse, but without intent to make physical contact with the minor or an intent to create an image or video of the minor. Such

conduct falls outside of any of the relevant federal statutes.  Mr. Ash's Alabama conviction is categorically broader than any of the applicable federal statutes, so it is not a qualifying sex offense conviction that warrants the application of USSG § 4B1.5.  Therefore, Mr. Ash has a criminal history category I.  At CHC I and offense level 40, the applicable guidelines range is 292-365.

**B.  Variance From the Guidelines Calculation.**

### 1.  The Criminal History Category Adjustment in USSG § 4B1.2(a)(2)(B) Overstates Mr. Ash's Criminal History.

If the Court disagrees with Mr. Ash's above argument about his Criminal History Category, Mr. Ash asks the Court to vary from CHC V to CHC I.  The adjustment under USSG § 4B1.2(a)(2)(B) increases Mr. Ash's guidelines range (at offense level 40) from 292-365 to 360-life, raising the low end of the guidelines by over five years based on a criminal conviction that is already accounted for in Mr. Ash's original criminal history calculation.  Like other sentencing guidelines for sex offenses, amendments and enhancements were based on Congress's actions dictating higher mandatory minimums and increased penalties for these types of offenses, not empirical evidence or study.  Section 4B1.5 was drafted after Congress directed the Commission to increase penalties for offenders who engaged in a pattern of activity.  United States Sentencing Commission, *Fifteen Years of Guideline Sentencing* at 72, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/chap2.pdf.  The Guideline was not drafted using statistics or empirical evidence that demonstrated a need for higher guidelines.  "The frequent mandatory minimum legislation and specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission

6

from those of Congress." *Id*. at 73.  The lack of empirical evidence to justify the enhancement in

4B1.5 justifies a downward variance to CHC I.

> ### 2. The use of a computer enhancement applies in virtually every case and has lost the ability to meaningfully distinguish between defendants.

The defense submits that the two-level enhancement for use of a computer should be

rejected on policy grounds.  A sentencing judge "may vary from Guideline ranges based solely

on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at

101.  The defense argues that the same policy disagreement with the use of a computer

enhancement in child pornography cases applies to the enhancement here.  The computer

enhancement here, like the child pornography guidelines, was not based on empirical data and

should not be followed.  *See United States v. Dorvee*, 616 F.3d 174 (2d. Cir. 2010); *United States

v. Baird*, 580 F. Supp. 2d 889 (D. Neb. 2008); *United States v. Shipley*, 560 F. Supp. 2d 739

(S.D. Iowa 2008).  The logic in *Grober* also applies here, where the computer enhancement is

essentially inherent in the crime and applied in almost every case.  *United States v. Grober*, 624

F.3d 592, 597 (3d Cir. 2010).[2]

The purpose of sentencing enhancements is to differentiate between cases, but the fact

that a use of a computer enhancement applies in virtually every case creates no differentiation

and instead merely creates a higher base offense level.

---

[2] The Second Circuit also agreed with this analysis in *United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010) and *United States v. Volpe*, 224 F.3d 72 (2d Cir. 2000).  These cases explain in detail why certain enhancements would apply in almost every case.  For example, the computer enhancement allows "double-counting" because it effectively increases a defendant's sentence to reflect the kind of harm that has already been accounted for by the modern day offense levels. Coercion and enticement cases are almost always based on electronic communications with an undercover officer either posing as a parent with a child or as a minor themselves.  The reality of the offense today and the government's tactics in locating and charging individuals with coercion and enticement demonstrate that the use of a computer enhancement no longer differentiates between cases.

### 3. The Court should vary to give Mr. Ash credit for acceptance of responsibility.

Mr. Ash acknowledges the destruction of the cellular devices constituted obstruction of justice and agreed in the plea agreement that he also would not receive acceptance of responsibility under the guidelines. Mr. Ash is not asking the Court to calculate the Guidelines differently from that agreed to in the plea agreement, but instead to vary to give him credit for acceptance of responsibility.

Since his arrest in this case, Mr. Ash has agreed to every continuance requested by the government to allow them time to try to recover and access his electronic devices, demonstrating his willingness to work with the government to provide them the time needed to investigate his case. Mr. Ash also entered a knowing and voluntary plea, admitting to his conduct, fully aware that his plea in this case would subject him to higher potential penalties in the pending federal case in Alabama.

In fact, the many continuances permitted the government to engage in extensive investigation which resulted in the second indictment in federal district court in Alabama. Mr. Ash fully recognizes the charges and potential time he faces in Alabama and still entered into the guilty plea here. His acknowledgement of his actions in destroying the phones and full acceptance of responsibility warrants a variance to account for his acceptance of responsibility.

### 4. The Variance Guidelines range is 168-210 months.

If the Court accepts the above arguments for a variance, Mr. Ash asks that the court consider the relevant variance Guidelines range of 168-210 months. This range results if the Court considers Mr. Ash in CHC I, subtracts two offense levels for use of a computer, and subtracts three offense levels for acceptance of responsibility, resulting in CHC I and offense level 35.

## C.  Section 3553(a) Factors.

In reviewing all of the applicable factors set forth in § 3553(a), Mr. Ash submits that the mandatory minimum applicable in this case—10 years of imprisonment—is the appropriate sentence in this case; and that a sentence of imprisonment greater than 120 months of incarceration would be greater than necessary to meet the sentencing purposes set forth in § 3553(a)(2).

A particular concern is the very significant enhancement in punishment one is likely to receive when convicted of a sex offense such as this. Inmates convicted of charges such as his frequently suffer from assault.  *See United States v. Kelly*, 868 F. Supp. 2d 1202, 1204 n.1 (D.N.M. 2012) (noting that defendant sentenced in prior case beaten to death within days of arriving at the federal penitentiary); *see also Inmate Sentenced to 15 Years to Life in Prison for Beating-Murder of Fellow Inmate Believed to be in Custody for Child Molest[ation]*, Orange County, California District Attorney Press Release, Mar. 21, 2012) (inmate convicted of misdemeanor possession of child pornography, a 72-year-old attorney, was beaten to death within days of arriving at federal prison); Kristen Dize, *Harford County Sex Offender Killed in State Prison*, BELAIR PATCH, June 28, 2012; Rina Palta, *For the third time this month, a sex offender is killed in prison*, May 29, 2012.[3]  As the above examples demonstrate, the risk of violent assault on anyone charged with these crimes is very real.

Mr. Ash also must register as a sex offender upon his release, with the publication of that information to the community and to his friends and neighbors.  Mr. Ash's sexual offender designation will effectively make him a social outcast for the rest of his life.  He will be banned from living in many neighborhoods and even entire towns.  *See, e.g.*, *New York Times* Op-ed,

---

[3] Available at http://www.scpr.org/blogs/news/2012/05/29/6370/inmate-killed-la-prison/

"Sex Offender Village" (May 21, 2013); *New York Times*, "Restricted Group Speaks Up, Saying Sex Crime Measures Go Too Far" (October 1, 2013).  His name and address will be readily available on the Sex Offender Registry, something anyone with a computer can view.  Finding employment as a registered sex offender will be extremely difficult.  As set forth in the *New York Times* piece:

> We live in a society that is terrified of sex offenders, sometimes with good reason. But in some cases the perpetrators, and not just the victims, are denied justice. Every high-profile sex crime spawns a rush to do something about the "predators" among us. Unfortunately, these so-called solutions are doing more harm than good. In the past 25 years, the laws governing sex offenses have gone from punitive to draconian to senseless. The term "sex offender" simply covers too wide a range now, painting the few truly heinous crimes and the many relatively innocuous ones with the same broad brush. This overly broad approach wastes resources that could be better spent, for instance, on clearing the huge and unforgivable backlog of untested rape evidence kits.

> We see even deeper problems: the explosion of sex offender registries, stringent yet demonstrably ineffective residency restrictions, and the bizarre world of "civil commitment," where we punish what someone might do rather than what he or she has done. All of this suggests that our entire approach to dealing with sex offenders has gone tragically off the rails.

As several courts have recognized, the collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id*. § 3553(a)(2)(A),

and "adequate deterrence," *id*. § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089

(D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that

defendant suffered substantial mental and personal stress as a result of his prosecution, because

the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to

reflect, among other things, "the history and characteristics of the defendant," the need to

"protect the public from further crimes of the defendant," the need to "provide just punishment

for the offense," and the need to "afford adequate deterrence"").

Additionally, Mr. Ash is not only facing a sentence in this Court, but he is also facing (1)

up to 15 years of backup time on his prior conviction in Alabama State Court and (2) an

extremely significant sentence, especially due to the potential for higher statutory penalties after

his conviction in this case, in a pending federal case in the Northern District of Alabama.

Despite the fact that all of Mr. Ash's conduct in this case arose in Alabama and the investigation

that led to the charges in Alabama stemmed from the government's investigation in this case,

neither U.S. Attorneys' Office was willing to agree to transfer venue to the other for potential

joint resolution. Therefore, due to the government's charging decisions and the desire for

multiple U.S. Attorneys' Offices to seek their pound of flesh from Mr. Ash, he faces significant

potential additional punishment.

### 1.  History and Characteristics of Mr. Ash.

Mr. Ash was born in Birmingham, Alabama where he lived with his parents and older

brother until they moved to Florida when he was 5 years old. Growing up, Mr. Ash was a victim

of bullying and harassment from his peers and his older brother. Mr. Ash suffered from ADHD

and was in special education classes growing up, which caused his classmates to mock and

harass him, even extending to physical violence. PSR ¶ 57. ███████████████████

██████████████████████████ Growing up, Mr. Ash did not feel like he fit in and his struggles in school and with making friends permeated into adulthood.

After graduating high school, Mr. Ash chose to move away from his parents and brother to live with his grandmother in Alabama. It was in Alabama that Mr. Ash began to thrive. He continued his education in community college, earning an Associates Degree in applied science, *id*. ¶ 76, and joined a local volunteer fire department and received training to work as an EMT. *Id*. ¶ 81. He enjoyed helping others and was proud of the work he was doing. *See* Ex. A, Letter from Mr. and Mrs. Ash ("At the age of 19, Graham took an important step in his journey by moving to Alabama to live with extended family. It was there that Graham discovered his passion for service as a volunteer firefighter. This experience inspired him to dedicate his life to helping others and he became an EMT, working on an ambulance for several years."). However, over time, the stress and trauma of the work began to wear on him, and he transitioned to working in a lab as a medical technician. Mr. Ash has always been a hard worker, maintaining constant employment since he joined the workforce.

Mr. Ash has two daughters who he loves. *Id*. ¶¶ 60-61. When his second daughter was only one year old, he received full custody of Ellie and she lived with him for about two years. While Mr. Ash was the sold caregiver for his daughter, he was also going to community college and working as a medic. He did everything in his power to provide for his family and continued, up until his arrest in this case, to pay child support and be in his daughters' lives as much as possible.

Mr. Ash remained close with his parents his entire life until his conviction in 2019 permanently altered their relationship. Mr. Ash accepted responsibility for his actions in that case and it resulted in the loss of his connections with friends and family. He has been working

12

during his current incarceration to rebuild that relationship with his parents and it is clear from their letter to the Court that they want to support him in future treatment and rehabilitation. Ex. A ("We are deeply aware of the challenges Graham currently faces, and we assure you that this situation is an aberration in his life. We believe that his past actions, character, and potential to contribute positively to society deserve consideration in determining the next steps for his future.").

While at the D.C. Jail, Mr. Ash has connected with a counselor and worked diligently over the last year to start his path of treatment and rehabilitation. He is committed to continuing therapy in the Bureau of Prisons and taking advantage of all the services available to him, which will put him in the best possible position to rejoin his family upon his release.

While Mr. Ash has a prior conviction in Alabama for similar conduct, he sadly did not receive any support or treatment to help him address any of the underlying issues that led to his conviction in the first place. ████████████████████████████



████████████████████ Mr. Ash is committed to receiving whatever treatment is available to him; treatment which was not available to him after his previous conviction.

For all of the reasons described above, Mr. Ash's history and characteristics support a downward variance to the mandatory minimum sentence of 120 months incarceration.

### 2.   The Nature and Circumstances of the Offense.

18 U.S.C. § 3553(a)(1) directs the Court to look at the nature and circumstances of the offense and Mr. Ash's history, which is discussed above. The details of his criminal conduct are accurately summarized in the PSR and Statement of Offense.  Mr. Ash was arrested on October 3, 2023, pursuant to an investigation that arose from an online conversation between Mr. Ash and an undercover officer based in Washington, D.C.  Mr. Ash recognizes the gravity of his conduct and that he faces a significant period of incarceration.  He accepted full responsibility for his conduct and is open to sex offender treatment and mental health treatment, both of which will lessen the chances of reoffending.

### 3.   The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities.

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper*, 562 U.S. at 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).  Pursuant to 18 U.S.C. § 3553(a)(1)(2)(A), Mr. Ash's sentence must reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  While the sentence must provide deterrence and protect the public, it must also provide Mr. Ash with educational and vocational training and medical care.  In balancing all of the purposes of sentencing, the Court has to strike the appropriate balance between the punitive sanction, protection for the community and the long-term goal of rehabilitation.

18 U.S.C. § 3553(a)(2)(D) directs the Court to fashion a sentence that provides Mr. Ash with necessary "medical care" or other "treatment in the most effective manner." The Sentencing Reform Act promoted the identical goal in a non-custodial setting by "reject[ing] Imprisonment as a means of promoting rehabilitation." *Mistretta v. United States*, 488 U.S. 361, 367 (1989). Mr. Ash will need continued support to ensure his rehabilitation will carry him through the remainder of his life. Mr. Ash also needs ongoing mental health treatment to continue the progress he has made over the last year and a half. Obtaining rehabilitative treatment is a statutorily-recognized purpose of sentencing. 18 U.S.C. § 3553(a)(2)(D); *cf. Tapia v. United States*, 131 S. Ct. 2382, 2387 (2011) ("These four considerations—retribution, deterrence, incapacitation, and rehabilitation—are the four purposes of sentencing generally, and a court must fashion a sentence "to achieve the[se] purposes . . . to the extent that they are applicable" in a given case.") (citing 18 U.S.C. § 3551(a)).

As the Commission further reports, recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *Sentencing Commission Report on Child Pornography* at 278 & n.31 (citing a project funded by the Department of Justice), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282. "[T]he research consistently demonstrates that recidivism rates for people who have been convicted of a sex offense are substantially lower than most people believe, and in fact, are among the lowest of all people convicted of a crime." Mary Helen McNeal & Patricia Warth, *Barred Forever: Seniors, Housing and Sex Offense Registration*, 22 Kan. J.L. & Pub. Pol (Spring 2013), at 344-45. The Bureau of Justice Statistics reports that "compared to non-sex offenders released from State prison, sex offenders had a lower overall rearrest rate." *Id*. at 345, citing U.S Department of

15

Justice, Office of Justice Programs, Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994, (2003), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/ rsorp94.pdf.  "Researchers conclude that long-term recidivism rates are lower for sex offenders than for the general criminal population.  Researchers also have argued that offenders who receive specialized and intensive sex offender treatment have a significantly lower rearrest rate than offenders who did not participate in treatment."  CSOM, Office of Justice, Department of Justice, *An Overview of Sex Offender Management*, July 2002, available at http://www/csom.org/ pubs/csom_bro.pdf at p. 4.  "Research demonstrates that observed recidivism rates for sexual, violent, and non-violent crimes are lower when sex offenders receive appropriate interventions, such as proper supervision and treatment."  Department of Justice Publication, *The Comprehensive Approach to Sex Offender Management* (Nov. 2008), pp 1-2, available at http://www.csom.org/pubs/Comp_Approach_Brief.pdf.  "Treatment is an essential component of a comprehensive sex offender management system.  The primary goal of sex offender treatment is to assist individuals to develop the necessary skills and techniques that will prevent them from engaging in sexually abusive and other harmful behaviors in the future, and lead productive and prosocial lives."  *Id*. at 5.  Additionally, a sentence of 10 years would result in Mr. Ash's release in his fifties at the earliest, even assuming he faces no additional time in Alabama.  "For years, research has consistently confirmed one fact: recidivism rates decline with age."  *Barred Forever*, at 346.  The "aging effect" exists regardless of any other factors.  *Id*.

Sex offender treatment has demonstrated that cognitive-behavioral therapy is very useful in helping offenders learn to control their propensities.  *See e.g.* Ward, Gannon, and Yates, *The Treatment of Offenders: Current Practice and New Development with an Emphasis on Sex Offenders*, 15 Int'l Rev. Victimology 183 (2008); Aos, Miller and Drake, Washington State

Institute for Public Policy, *Evidence Based Adult Corrections Programs: What Works and What Does Not* 5-6 (2006) (concluding after review of six rigorous studies that "cognitive behavioral therapy for sex offenders on probation significantly reduces recidivism."). Because sex offender treatment in the BOP typically is not begun until approximately three years before release, a lengthy prison term is not necessary and, in fact, can be counterproductive to obtaining appropriate treatment. In short, a sentence of 10 years with supervised release with appropriate conditions is more than sufficient to ensure that Mr. Ash does not re-offend.

There is no minimizing Mr. Ash's criminal conduct. However, a sentence in excess of the agreed upon 10 years would be "greater than necessary." The only measurable goal in a prolonged period of incarceration would be the satisfaction of a punitive sanction. But punishment alone does not promote any of the other and equally important statutory goals enumerated in 18 U.S.C. § 3553(a). The requested sentence is "just punishment" when the Court considers and takes into account 18 U.S.C. § 3582. In pertinent part, 18 U.S.C. § 3582(a) states:

> The Court, in determining whether to impose a term of imprisonment, and if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation.* (emphasis added).

The recommended sentence would also not create unwarranted sentencing disparities. The U.S. Sentencing Commission's Quick Facts on Sex Abuse Offenses for 2022 states that 52.2% of sexual abuse offenders were sentenced under the Guidelines Manual range and 4.8% of all sexual abuse offenders received some other downward departure, with an average sentence reduction was 38.3%.[4] Approximately 44.3% of all sexual abuse offenders received a downward

---

[4] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Sexual_Abuse_FY22.pdf.

variance, with an average sentence reduction of 30.8%. Thus a sentence of 10 years will not cause unwarranted sentencing disparities in this case. Indeed, the most effective deterrent is the certainty of punishment, rather than its length.[5]

Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

A sentence of more than 10 years would be excessive and would cause disparity with other sentences. *See e.g. United States v. Kenneth Drew*, No. 12-cr-01 (RLW) (defendant who pretended to be a young man, stalked 14 year old, and according to victim repeatedly engaged in oral sex against her will after threatening to circulate alleged naked photos of her if she refused, sentenced to 84 months); *United States v. Robert Henry*, No. 12-cr-280 (BAH) (defendant who traveled with intent to engage in illicit sexual contact with very young child and according to victims had prior sexual contact with multiple actual child victims, sentenced to 135 months); *United States v. James Brown*, No. 12-cr-155 (RJL) (defendant who distributed child pornography, arranged to meet to engage in sexual contact with a 12 year old, and who was

---

[5] *See, e.g.*, Nat'l Resource Council, The Growth of Incarceration in the United States, at 131 (2014); *see also* Nat'l Inst. of Justice, U.S. DOJ Office of Justice Programs, *Five Things About Deterrence* (2016) available at https://www.ojp.gov/pdffiles1/nij/247350.pdf. Specifically, research shows that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."

under investigation for sexual abuse of his grandchildren and was accused of sexual abuse of his own daughter (both of which he conceded the government could prove) sentenced to 144 months); *United States v. Harold Reynolds*, No. 09-cr-117 (JR) (defendant who distributed child pornography and admitted had previously abused and molested his daughter on at least two occasions, sentenced to 121 months); *United States v. Gregory Loreng*, No. 12-cr-132 (JDB) (defendant who possessed and distributed child pornography and had previously abused his adopted sister over multiple years, sentenced to 96 months).  In the context of the sentences for these difficult cases, a sentence of 120 months for Mr. Ash is sufficient but not greater than necessary to meet the sentencing needs identified by statute.

### III. CONCLUSION

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Ash respectfully requests that the Court impose sentence of the 120-months.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

 */s/ Diane Shrewsbury*
Diane Shrewsbury
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

19